CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

FEB 0 2 2011

JULIA ... LEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| DEBORAH MERRITT,<br>*Plaintiff,*<br><br>v.<br><br>OLD DOMINION FREIGHT LINE, INC.,<br>*Defendant.* | CIVIL ACTION NO. 6:07-CV-27<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Plaintiff brings this gender discrimination suit against Old Dominion pursuant to Title VII of the Civil Rights Act of 1964, § 701 *et seq.*, 42 U.S.C. § 2000e *et seq.* Now pending before the court are Defendant Old Dominion Freight Line Inc.'s, ("Old Dominion") motions in limine to preclude Plaintiff Deborah Merritt ("Merritt") from introducing certain arguments and evidence at trial. A hearing on the motions was held on January 21, 2011. For the reasons given herein, the motion concerning back pay and front pay (docket no. 79) will be denied; the motion concerning expert testimony (docket no. 81) will be granted in part; the motion to preclude evidence as irrelevant will be denied (docket no. 83); and the motion regarding the preclusive effect of prior rulings (docket no. 85) will be granted in part.

## I.    BACKGROUND[1]

Plaintiff was a truck driver for Old Dominion, a company that employs both "Line Haul" and "Pickup and Delivery" ("P&D") drivers. Whereas Line Haul drivers generally travel long distances and may spend extended periods away from home, P&D drivers work locally, during regular business hours. The P&D job is more physically demanding because it requires the

---

[1] A more complete statement of facts is given in *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289 (4th Cir. 2010).

frequent loading and unloading of cargo.

After working for six years as a Line Haul driver for Old Dominion, Plaintiff sought to transition to a P&D position. In May 2002, she began filling in as a temporary P&D driver, a job she performed without incident or complaint. When a permanent P&D position opened in Old Dominion's Lynchburg, Virginia terminal, Merritt asked terminal manager Bobby Howard whether she could fill the post. However, Howard ultimately filled the position with a less experienced male who had not previously worked for the company. When another permanent position opened in May 2003, Merritt again expressed interest to Howard. Again, he hired a less experienced male driver.

Howard allegedly explained that "it had been discussed and it was decided that they could not let a woman have that position" and that "the company did not really have women drivers in [P&D positions]." On separate occasions, Howard allegedly told Plaintiff that Old Dominion Regional Vice President Lemuel Clayton "was afraid [a female] would get hurt" and that he "didn't think a girl should have that position." Clayton denies making such statements.

When Merritt was finally given a Pickup and Delivery position in March 2004, she was placed on a 90-day probationary period. The parties dispute whether similarly situated male drivers were also subject to probation. Plaintiff performed her duties from March 2004 to September 2004 satisfactorily. Then, after suffering what Dr. Jay Hopkins diagnosed as an ankle strain while on the job on September 29, 2004, Merritt was placed on light-duty work. After a follow-up appointment on December 27, 2004, Dr. Hopkins declared the Plaintiff to be "on the right track." He later testified that "there was nothing about Ms. Merritt's medical condition which would have prevented her from performing her job duties as a Pickup and Delivery driver for Old Dominion as of December 27, 2004."

Between her injury and the follow-up appointment with Dr. Hopkins, Old Dominion Vice President of Safety and Personnel, Brian Stoddard, ordered Merritt to take a Physical Ability Test ("PAT"). Defendant contends that the PAT was designed to evaluate the test taker's ability to perform tasks related to P&D job duties. After Merritt failed the test on December 28, 2004, Stoddard decided to terminate her. The decision was his alone. Old Dominion records show that Merritt was fired on February 1, 2005 for "inability to perform job."

After filing a discrimination claim with the Equal Employment Opportunity Commission and receiving notice of right-to-sue, Merritt brought suit in this court. She proceeded on two theories of relief, disparate impact and disparate treatment. On cross motions for summary judgment, the court ruled in favor of Old Dominion on both theories. The Fourth Circuit reversed and remanded, holding that whether Old Dominion intentionally discriminated against Merritt was a triable issue of material fact. Merritt did not contest, and the Fourth Circuit did not consider, this court's decision on disparate impact.

## II.    DISCUSSION

Defendant has filed four motions in limine. First, Old Dominion seeks to preclude Plaintiff from recovering, or presenting any evidence concerning, back pay and front pay allegedly due to Plaintiff after July 14, 2008. (docket no. 79). Second, Defendant seeks to prevent Plaintiff from introducing the expert testimony of Michael K. Napier, Sr. (docket no 81). Third, Defendant seeks to exclude as irrelevant evidence concerning (a) Old Dominion's treatment of employees other than Merritt; (b) attitudes of employees other than Brian Stoddard; and (c) the propriety of administering the physical ability test. (docket no. 83). Finally, Defendant seeks to prevent Merritt from raising arguments inconsistent with prior rulings in this case. (docket no. 85).

## A. Back Pay and Front Pay

Defendant moves to preclude Plaintiff from recovering, or introducing evidence regarding, front pay and back pay accrued after July 14, 2008. For the following reasons, the motion will be denied.

Title VII requires a wrongfully terminated plaintiff to mitigate damages by seeking comparable employment. *See* 42 U.S.C. § 2000e-5(g). Where the plaintiff "has failed to 'be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which she was discharged,'" an award of back pay or front pay is inappropriate. *Szedlock v. Tenet*, 139 F. Supp. 2d 725, 734 (E.D. Va. 2001), quoting *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985); *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 67 (1st Cir. 2005) ("One recognized reason for denying front pay is the plaintiff's failure to mitigate damages by seeking comparable employment.").

The uncontroverted evidence shows that Merritt applied to fifty-four companies over a three-and-a-half year period following her termination from Old Dominion. Many of the companies were in the trucking business. Despite some success interviewing with one such company, it indicated that it did not hire Merritt because of Old Dominion's negative reference. In July 2008, Merritt took a $6.50/hour job driving a van for Professional Transportation, Inc. ("PTI"). After an unpleasant experience, one week into her employment, she quit. Discouraged, she stopped actively searching for employment comparable to her trucking job as of July 14, 2008. However, she has not been without work. She indicates that since 2005 she has earned approximately $8,000 to $9,000 per year cleaning houses for friends, family, and neighbors. Nonetheless, Defendant submits that because Merritt stopped actively looking for higher paid work after July 14, 2008, she should be precluded from recovering front pay, or back pay

4

accrued as of that date.

A plaintiff need not prolong the search for employment indefinitely. Where he "has exercised reasonable diligence to find similar employment, has been unable to do so, and then accepts a lower paying job . . . the duty to mitigate damages [does not] require that claimant [to] continue to search for higher paid employment." *Brady*, 753 F.2d at 1274. *See also Nord. v. United States Steel Corp.*, 758 F.2d 1462, 1471 (11th Cir. 1985) (duty to mitigate satisfied where plaintiff helped spouse start business that might provide future income); *J.H. Rutter Rex Mfg. Co. v. NLRB*, 473 F.2d 223, 242 (5th Cir.), *cert. denied,* 414 U.S. 822 (1973) (duty to mitigate satisfied where plaintiff's lower paying job was the best job available). In *Brady*, the plaintiff had been discharged from his full-time construction job in 1978. After enrolling in college, he continued an unsuccessful but diligent search for comparable work. In fall 1979, he stopped actively searching when he accepted a full-time job with a country club. But as the country club job paid considerably less than his earlier employment, the defendant argued that the plaintiff was precluded from recovering back pay. The Fourth Circuit disagreed, holding that "a year of fruitless searching for comparable work was enough . . . ." 753 F.2d. at 1275.

All evidence before the court suggests that Merritt compares favorably to the plaintiff in *Brady*. She began mitigating damages in 2005 by cleaning houses. Meanwhile, she applied for jobs with fifty-four employers over a three-year span. Furthermore, there is no evidence that jobs comparable to her position at Old Dominion are readily available. *Cf. EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 906 (9th Cir. 1991). However, there is evidence that Old Dominion told a trucking company, which was initially receptive to Merritt's application, that Merritt was fired for "inability to perform job." In light of those factors, Merritt was not required to continue her fruitless job search beyond July 2008.

Nor does Merritt's voluntary departure from PTI preclude her recovery. Assuming, *arguendo*, that Merritt did not have good cause to leave PTI, the appropriate remedy would be to reduce her recovery, not preclude it entirely. *See Brady*, 753 F.2d at 1273 ("where the discharged Title VII plaintiff subsequently finds similar employment, but then voluntarily quits, back pay should be decreased by the amount he would have earned had he not quit."); *See also Griffin v. George B. Buck Consulting Actuaries, Inc.*, 566 F. Supp. 881, 882 (S.D.N.Y 1983) ("When a plaintiff has obtained employment equivalent to that from which he was excluded by the defendant, and quits without adequate reason, the backpay award must be offset by the amount the plaintiff would have earned had he kept the job."). It is evident that Merritt's job with PTI was not comparable to her former position with Old Dominion, in which she earned approximately $45,000 to $50,000 annually. Instead, the $6.50/hour position was at best marginally more lucrative than her house keeping job. Assuming Merritt did not have good reason to leave PTI, her award would be decreased in an amount proportionate to the difference in income between her house keeping job, and the PTI job.

However, the heretofore uncontested evidence suggests that Merritt left PTI for good cause. An award will not be abated where the plaintiff quits his new job because of unreasonable working conditions . . . ." *Brady*, 753 F.2d at 1277-78 (citing cases). Merritt has testified that PTI lied to her about her wage, misled her concerning her job duties, and paired her with a trainer who subjected her to verbal and physical abuse, and abandoned her by the road side in the middle of the night.

In light of the above, Defendant's motion will be denied.

## B. Expert Testimony of Michael K. Napier, Sr.

Defendant further moves to preclude the expert testimony of Michael K. Napier, Sr.
Napier holds himself out as an expert on commercial motor vehicle operations, human resources
and safety, trucking, and motor fleet carrier safety and risk management. He has held a
commercial driver's license since 1992, and has logged over 250,000 miles of tractor-trailer
driving experience. Furthermore, he has "hired, trained and supervised thousands of commercial
motor vehicle drivers and their supervisors." In addition, he has owned, operated and sold two
separate trucking companies, and served for five years as a senior vice president charged with
safety, compliance, and human resources for a "sizeable motor carrier and logistics/brokerage
company." Moreover, he is accredited by the North American Transportation Management
Institute as a Certified Director of Safety for motor fleet safety supervision.

Federal Rule of Evidence 702 provides that an expert qualified "by knowledge, skill,
experience, training, or education, may testify" to scientific, technical, or other specialized
knowledge if it will assist the trier of fact. Such testimony is only admissible if "(1) the
testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable
principles and methods, and (3) the witness has applied the principles and methods reliably to the
facts of the case." Fed. R. Evid. 702. The trial judge has a "gatekeeping" obligation to exclude
unreliable expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589
(1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Such exclusion is governed
by Rule 104(a), which requires the proponent to establish by a preponderance of the evidence
that any admissibility requirements are met. *See Daubert*, 509 U.S. at 592 n. 10; Fed. R. Evid.
702 advisory committee's note (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)).

The Fourth Circuit has advised that "the test for exclusion [of expert testimony] is a strict

one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir.1993) (internal quotations omitted). In addition, the expert's qualifications must be "liberally judged." *Id.*

*Daubert* set forth five factors that the court may consider to evaluate the admissibility of an expert's technique or theory: (1) whether it can be tested, or whether it is merely subjective and conclusory; (2) whether it has been subject to peer review and publication; (3) whether potential error rates are known; (4) whether there are standards controlling the technique's operation; and (5) whether it is generally accepted in the scientific community. 509 U.S. at 593-94; *Kumho Tire*, 526 U.S. at 141. However, these factors are neither exclusive nor dispositive, and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." 526 U.S. at 142; *See also Maryland Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 784-85 (4th Cir.1998); *Simo v. Mitsubishi Motors North America, Inc.*, 245 Fed. App'x 295, 301 (4th Cir.2007) (unpublished opinion).

In discovery, Plaintiff produced Napier's expert report, which identified thirteen conclusions to which Napier would likely testify at trial. In consideration of the report and the parties' arguments, Napier may testify to certain opinions. While he may generally testify concerning industry practice, he may not opine on Old Dominion's subjective motivations, the credibility of Old Dominion's representations, and other matters more properly submitted to the jury.

### 1. Admissible Testimony

Rule 702 applies not only to "scientific" and technical knowledge, but also to "other

specialized knowledge." Where, as here, the expert's opinion is grounded in experience in a particular field, courts will generally not preclude his testimony merely because it is not tested, subject to peer review and publication, or has no known rate of error. *See United States v. Bynum*, 604 F.3d 161, 167 (4th Cir. 2010) (FBI agent qualified to evaluate authenticity of child pornography images); *United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007) (law enforcement officer qualified to explain drug-related code words); *The Harvester, Inc. v. Rule Joy Trammel + Rubio, LLC*, No. 3:09-cv-358, 2010 WL 2653373, at *2 (E.D. Va. July 2, 2010) (architect qualified to discuss similarity of architectural drawings). Although "'[e]xperiential expert testimony . . . does not rely on anything like a scientific method,' such testimony is admissible under Rule 702 so long as an experiential witness 'explain[s] how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'" *Bynum*, 604 F.3d at 167 (quoting *Wilson*, F.3d at 274).

Napier has sufficient experience to qualify as an expert on certain safety and employment practices in the trucking industry. It is particularly significant that he worked for fifteen years in the private sector, in positions in which he hired, supervised, and was responsible for the safety of employees. Also noteworthy is his accreditation as a Certified Director of Safety for motor fleet safety supervision by a national trucking organization. Furthermore, he has demonstrated specific knowledge of industry practices, for instance, by identifying the maximum weight loads that drivers for UPS are permitted to carry. In sum, Napier possesses "knowledge, skill, or experience exceeding that of the average juror." *Harvester*, 2010 WL 2653373, at *3 (citing *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006)); *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) ("an expert witness must possess some

specialized knowledge or skill or education that is not in possession of the jurors. . . .") (internal quotation marks omitted).

Plaintiff requests that the following conclusions be admitted:

5. Conclusion: [Old Dominion] inappropriately schedule Merritt to undergo a test that was designed to measure Merritt's ability to perform in a job she had worked in a real world environment for several months without complaints, problems, incidents, disciplinary action, or assistance.

10. Conclusion: [Old Dominion's] expectation of its P&D Driver's [*sic*], regarding the manual placing of heavy freight at heights out of their normal reach, places employees at unnecessary risk to injury.

11. Conclusion: The test given to Merritt was not consistent with the real world operation of a P&D Driver, nor was it typical of tests observed by [Napier].

Regarding all three, Napier's testimony will be admitted to the extent it describes what the PAT tested, what qualifications and skills are ordinarily expected of P&D drivers, and whether and to what extent the PAT tested those attributes. Napier may also testify as to whether and what extent the PAT tested skills not necessary for the job. His training and experience provide an adequate basis for observations of that nature.

Old Dominion argues that the substance of conclusion ten is irrelevant and prejudicial. However, read together with the criticism of the PAT in conclusion eleven, conclusions ten tends to suggest that the PAT, and the job description on which it was based, do not reflect what is ordinarily expected of P&D drivers in the industry. Contrary to Defendant's contention, industry practices, and the extent to which Old Dominion may have departed from the norm, are relevant to this case. Old Dominion avers that the only issue that the jury may consider is whether it applied the PAT in a discriminatory manner. But while it is true that the discriminatory application of a test is probative of wrongdoing, evidence that the test sets the subject up for failure has added probative value.

Although courts may not generally inquire into a company's business judgment, they may do so where, as here, there is evidence that the company's stated rationale for an employment action was mere pretext for an impermissible decision. *See Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377 (4th Cir. 1995). Whether an employer's action was out of the ordinary is relevant to that issue. "The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext ...." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir.1979). *See also* Part C(3), *infra*.

Old Dominion further suggests that conclusion eleven is inconsistent with conclusion ten. However, there is no such inconsistency. Conclusion ten criticizes Old Dominion's expectations of its P&D drivers as "far below the industry standards of care." Conclusion eleven characterizes the PAT as inconsistent with "real world" expectations for P&D drivers. The two are complementary, not inconsistent.

### 2. Inadmissible Testimony

At a hearing before this court, Plaintiff conceded that the following would be impermissible subjects for Napier's testimony:

> 1. Conclusion: Before having her employment terminated, Merritt was a physically qualified CMV driver who, prior to her ankle sprain, had successfully performed her duties as an [Old Dominion] Line-Haul Driver and P&D Driver for a combined total of nine (9) years without complaints, problems, incidents, disciplinary action or assistance. ...

> 4. Conclusion: [Old Dominion] did not require Merritt's male counterparts to be subjected to the same probationary policy they placed on her.

> 6. Conclusion: [Old Dominion's] contention that Merritt was given the test due to her being released to return to regular work on a "trial basis" is not credible.

> 7. Conclusion: [Old Dominion's] motivation in unnecessarily subjecting Merritt to a comprehensive PAT exam is suspect.

> 8. Conclusion: At the time of Merritt's termination, as well as the date on which [Old

Dominion] subjected her to the PAT exam, Merritt's foot had returned to the condition it was in prior to the September 29, 2004 foot sprain.

12. Conclusion: [Old Dominion] subjected Merritt to a test that was not free of bias towards women.

As Plaintiff has conceded these issues, Defendant's motion will be granted to the extent it pertains to the above.

Under Rule 702, if the expert's testimony would not "assist the trier of fact," it should not be admitted. Where lay jurors are capable of understanding and drawing inferences from the underlying evidence, the proffered testimony will not assist the jury. *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 324 (4th Cir. 1982) (upholding exclusion of expert testimony correlating higher contracting costs with longer hauling distances); *Scott v. Sears, Roebuck, & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986) (district court erred in admitting evidence that persons wearing heels avoid walking on grates). Therefore, the following are not proper subjects for Napier's testimony:

2. Conclusion: It is reasonable that Merritt would not file a complaint with [Old Dominion's] management team regarding the statements made to her concerning her not receiving the P&D Driver positions due to her being a woman. . . .

3. Conclusion: On at least two (2) separate occasions, [Old Dominion] denied Merritt's requests for vacant P&D Driver positions at the Lynchburg terminal. On both occasions the P&D Driver positions which were denied to Merritt were awarded to less experienced males. . . .

Napier based conclusion two largely on Merritt's claim that she feared retaliation. Similarly, he drew conclusion three from factual allegations in her deposition testimony. As a jury would be well qualified to evaluate Merritt's credibility, and the reasonableness of her fears, Napier's interpretation would not assist the trier of fact. *See Portsmouth Paving Corp.*, 694 F.2d at 324.[2]

---

[2] Plaintiff also argues that Rule 703 allows Napier to testify to conclusions two and three. Rule 703 allows an expert to draw opinions from facts about which he has no personal knowledge.

Plaintiff has conceded that Old Dominion's subjective concerns are not within Napier's personal knowledge or expertise. Therefore, the following are not appropriate subjects for his testimony:

> 9. Conclusion: [Old Dominion] exploited scores Merritt received on tests unrelated to her foot sprain as a means of justifying their termination of Merritt. [Old Dominion's] actions, in their termination of Merritt due to scores she received on tests unrelated to her foot sprain, were unjustified and outside the industry customs, practices, or standards of care.

> 13. Conclusion: [Old Dominion] was not concerned with getting Merritt back to work.

Napier purports to base these conclusions on his observation that Old Dominion departed from industry practices. Although such practices may be a proper subject of his testimony, the jury would not benefit from Napier's gloss on Old Dominion's alleged departures therefrom. Also, both of the above conclusions essentially assert that Old Dominion's actions were pretextual. Whether that is true is best left for the jury.

Moreover, Napier's ninth conclusion is also deficient because it lacks "a reliable basis in the knowledge and experience of [the expert witness's] discipline." *Daubert*, 509 U.S. at 592. Elsewhere in his report, Napier claims that the PAT actually showed that the condition of Merritt's foot was satisfactory. He drew this conclusion from the mistaken belief that a 91% score on the "step test" portion of the PAT was passing. It was not. As Napier cannot reliably interpret PAT results, he will be precluded from doing so.

### C. Relevance

Defendant's third motion in limine asks that the court prevent Plaintiff from introducing "comparator" evidence. It also seeks an order excluding evidence that employees other than

---

However, the rule does not empower the court to disregard the requirement that the expert's opinion "assist the trier of fact." Fed. R. Evid. 702.

Brian Stoddard harbored biases against women. Further, it seeks to preclude evidence concerning the propriety of the PAT test. For the reasons discussed below, the motion will be denied.

### 1. Comparator Evidence

An aggrieved employee may prove discrimination in violation of Title VII by showing that he was treated differently from similarly situated employees. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258-59 (1981); *Haywood v. Locke*, 387 Fed. App'x 355, 358-59 (4th Cir. 2010) (unpublished opinion); *Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 Fed. App'x 255, 256 (4th Cir. 2007) (unpublished opinion); *Holtz v. Jefferson Smurfit Corp.*, 408 F. Supp. 2d 193, 206 (M.D.N.C. 2006). The plaintiff must show that these "comparators" are similarly situated "in all relevant respects" to the plaintiff. *Haywood*, 387 Fed. App'x at 359 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood*, 83 Fed. App'x at 359 (quoting *Mitchell*, 964 F.2d at 583).

Whether the comparators dealt with the same decision maker is paramount. *See Forrest*, 245 Fed. App'x at 257 ("If different decision-makers are involved, employees are generally not similarly situated.") (citing *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 350 n. 3 (7th Cir. 1997); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)); *Heyward v. Monroe*, 166 F.3d 332, 1998 WL 841494, at *2 (4th Cir. 1998) (unpublished table opinion) (same); *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994); *Holtz*, 408 F. Supp. 2d at 206; *Herron v. Virginia Commonwealth Univ.*, 366 F. Supp. 2d 355, 368 n.16 (E.D. Va.

2004).

Plaintiff will likely seek to introduce evidence that similarly situated employees were not required to undergo comprehensive physical testing after suffering injury. Of these employees, five out of seven were subject to no testing whatsoever. The remaining two were given a Functional Capacity Evaluation, which is unlike the PAT in that it is targeted to the locus of injury. *See* Table 1, below.

| TABLE 1. COMPARATORS | | | | |
|---|---|---|---|---|
| Name | Sex | Job | Description | Testing |
| *Plaintiff* | *F* | *P&D* | *Ankle strain; assigned to three months of light duty.* | *PAT.* |
| Gerald Dalton | M | P&D | Hernia; missed six months work; returned to light duty. | No testing. |
| Carolyn Fee | F | Line Haul | Knee surgery; missed five months of work. | No testing. |
| Charles Blalock | M | Line Haul | Compound leg fracture; 10% disability rating to leg. | No testing. |
| Debra Kelly | F | Line Haul | Neck surgery; missed six months of work. | No testing. |
| Bobby Miller | M | Line Haul | Crushed ankle, broken leg, cracked pelvis, two cracked vertebrae, broken collarbone, other internal injuries; missed fifteen months of work. | No testing. |
| Donald Smith | M | Line Haul | Shoulder injury; arthroscopic decompression and bicep tear. | Functional Capacity Evaluation. |
| Delores Taton | F | Line Haul | Broken leg bones; liver and brain injuries; missed four years of work. | Functional Capacity Evaluation. |

Defendant avers that Line Haul drivers are not similarly situated to P&D drivers because their job duties are distinct. A comparison of the job descriptions for each position shows that there are indeed some differences. *See Pls. Resp. Ex. D* (docket no. 89-4). Chiefly, P&D drivers must manipulate, load, and unload freight, and enter and exit the truck with greater frequency than Line Haul drivers. They must also spend a greater percentage of their day standing and walking. However, despite this difference, there is overwhelming similarity. Each requires the

driver to be able to perform, with mechanical assistance, the "frequent" pushing of weight up to 500 pounds. Each requires the driver to "load and unload full trailers of freight weighing as much as 50,000 pounds" prior to driving for up to eleven hours. Moreover, both P&D and Line Haul drivers share the primary responsibility of safely operating commercial motor vehicles. They are subject to similar certification requirements, drug and alcohol testing, training requirements, and minimum health standards. Moreover, they occupy a similar position within the corporate hierarchy. *Cf. Haywood*, 387 Fed. App'x at 359 (comparator was not similarly situated where he was six pay grades above the plaintiffs); *Holtz*, 408 F. Supp. 2d at 207 (comparators were not similarly situated where plaintiff was a plant manager and comparators held lesser managerial positions). Accordingly, the mere fact that certain of the comparators are Line Haul drivers will not preclude Plaintiff from introducing evidence concerning their treatment.[3]

Defendant also alleges that Plaintiff has failed to show that the comparators were subject to the same decision maker. However, as the Fourth Circuit noted, Brian Stoddard claimed responsibility for determining whether *any* employee was subject to physical testing:

> Stoddard testified that he has served as Vice President of Safety and Personnel "throughout the entire company" for the past eleven or twelve years, and, as Old Dominion admitted in its responses to interrogatories, Stoddard was therefore responsible for making all decisions regarding "question[s] about the physical capability of a driver to perform safely." When asked whether he is "consulted or informed whenever an Old Dominion employee is going to have to take [a physical fitness] test," Stoddard replied, "I'm the one that makes that decision, so, yeah, I'm informed. Actually I inform other people."

*Merritt*, 601 F.3d at 299 n. 2. In light of Stoddard's assertion, Defendant's objection is not persuasive. Therefore, Old Dominion's motion will be denied with respect to the comparator

---

[3] Old Dominion also asserts that the female line haul drivers are inappropriate comparators because they are within the protected class. However, as Plaintiff has consistently maintained that Old Dominion treats female *P&D drivers* inappropriately, this is unproblematic.

evidence.

## 2. Evidence Concerning Employee Attitudes

In disparate treatment cases, the "ultimate question . . . is whether the plaintiff was the victim of intentional discrimination." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (*en banc*) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)). Therefore, "[t]he protected trait 'must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'" *Id.* (quoting *Reeves*, 530 U.S. at 141) (internal quotation marks and alterations omitted). Ordinarily, "'statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden' of proving discrimination." *Id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).

Defendant moves to exclude evidence that employees at Old Dominion, other than Brian Stoddard, acted or spoke in a manner tending to denigrate women. For instance, Robert Howard purportedly said that Old Dominion simply did not have female P&D drivers, and it was "not a good idea" to do so. L.B. Clayton allegedly made similar comments. However, as Stoddard was the sole decision maker in Merritt's case, and there is no direct evidence that he was aware of these statements, Old Dominion argues that *Hill* requires the court to prevent Plaintiff from introducing evidence that any such statements were made. Although there is some force in this argument, the Fourth Circuit has addressed the issue thoroughly:

> We must of course be cautious about attributing to any ultimate decision maker such as Stoddard the most unfortunate expressions and beliefs of those around him and those who worked in his employ. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 291 (4th Cir. 2004) (*en banc*). It is regrettable that any distasteful comments will arise in the workplace, but that cannot mean that the actual decision maker is impugned thereby. It is the decision maker's intent that remains crucial, and in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced.

*See McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683,686-87 (7th Cir. 1991). But that nexus existed here. It is not unfair to observe that the corporate culture evinced a very specific yet pervasive aversion to the idea of female Pickup and Delivery drivers. Old Dominion employees, of all ranks, seemed to share a view that women were unfit for that position. A regional vice president remarked, for instance, that he "didn't think a girl should have that [Pickup and Delivery] position." He also worried that women were more injury-prone, explaining that he did not want to hire a female Pickup and Delivery driver because he "was afraid [she] would get hurt." An operations' manager stated, "[t]his is not a woman's place." A terminal manager forthrightly acknowledged the company's reluctance to hiring female Pickup and Delivery drivers, noting that "the company did not really have women [Pickup and Delivery] drivers," and that Merritt was passed over because "it was decided that [the company] could not let a woman have that position."

While the views of others are no proof of the views of Stoddard, at some point the corporate environment in which he worked places Stoddard's own selective use of the PAT in Merritt's case in a less neutral context. In *Lettieri* v. *Equant, Inc.,* 478 F.3d 640,649 (4th Cir. 2007), for example, we noted that the plaintiff had put forward the kind of "'evidence that clearly indicates a discriminatory attitude at the workplace and ... illustrate[s] a nexus between that negative attitude and the employment action.'" *Id.* (quoting *Brinkley* v. *Harbour Rec. Club,* 180 F.3d 598, 608 (4th Cir. 1999)). We accordingly deemed the plaintiff's "powerful evidence showing a discriminatory attitude at [her company of employment] toward female managers" sufficient to "allow a trier of fact to conclude that these discriminatory attitudes led to [plaintiffs] ultimate termination." *Id.* Likewise here.

*Merritt,* 601 F.3d at 300-301. Accordingly, Defendant's motion will be denied with respect to this issue.

### 3. Evidence Concerning Physical Ability Test

Defendant further moves that the court prohibit Plaintiff from inquiring into or offering evidence of the appropriateness of the PAT. It contends that such an inquiry would violate the general rule that prohibits courts from second guessing an employer's business judgment.

The Fourth Circuit has repeatedly cautioned that "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." *Jiminez v. Mary Washington College,* 57 F.3d 369, 377 (4th Cir. 1995); *DeJarnette v. Corning Inc.,* 133 F.3d 293, 298-299 (4th Cir. 1998) (same); *See also Mereish v. Walker,* 359 F.3d 330, 339 (4th Cir. 2004) ("It is not

our place to second-guess the soundness of scientific or managerial decisions under the guise of the ADEA.") However, a court may inquire into whether the employer's stated justifications are mere pretext for impermissible conduct. Thus, in *Jiminez*, the Fourth Circuit declined to evaluate a college's "[d]eterminations about such matters as [the plaintiff's] teaching ability, research scholarship, and professional stature . . . unless they can be shown to have been used as the mechanism to obscure discrimination . . . ." 57 F.3d at 377 (quoting *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir. 1980)). Likewise, in *DeJarnette*, the court acknowledged that it should not normally second guess the employer's reason for discharging the plaintiff, "so long as it *truly* was the reason for the plaintiff's termination." *DeJarnette*, 133 F.3d at 299 (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410-11 (7th Cir. 1997)) (emphasis added).

Moreover, there is wide agreement in other circuits that the business judgment rule should be applied flexibly where there is evidence of pretext.

> [T]he reasonableness of a business decision is critical in determining whether the proffered judgment was the employer's actual motivation. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (*en banc*) ("If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate-something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.") (footnote omitted); *Ryther v. KARE 11*, 108 F.3d 832, 840 (8th Cir. 1997) (holding that the factfinder was allowed to consider whether the survey that the employer relied upon as the basis for its decision to fire the plaintiff "was actually a sound-as opposed to pretextual-basis upon which to make employment decisions"); *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) ("Thus, facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness."); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir. 1979) ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext ....").

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003).

Here, Plaintiff seeks to establish that Old Dominion used the PAT results as a pretext for her wrongful termination. Importantly, the Fourth Circuit has concluded that Old Dominion's "variously unsupported, belated, and shifting rationales for requiring the PAT and hence discharging Merritt have passed the point of pretext." *Merritt*, 601 F.3d at 289. It further concluded that "[w]hile a neutral policy serving Old Dominion's legitimate business interests in public and employee safety could certainly be in place, a trier of fact could reasonably find that Old Dominion's selective application and ever-changing rationales for the PAT were designed to conceal an intent to reserve the plum Pickup and Delivery positions for male drivers only." *Id.* In this context, an inquiry into Old Dominion's business judgment is permissible under *Jiminez* and *DeJarnette*.

Therefore, Old Dominion's motion will be denied as it pertains to the PAT.

### D. Preclusive Effect of Prior Rulings

Defendant's final motion in limine initially proceeded on two theories, one based on collateral estoppel, and the other based on the law of the case doctrine. As Defendant has conceded the collateral estoppel claim, the motion will be denied with respect to that theory. However, as I conclude that the law of the case doctrine prevents plaintiff from introducing evidence of bias in the physical ability test, the motion will be granted in part.

The law of the case doctrine prevents a court from reopening issues decided earlier in the same litigation. Generally, it "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988)). The doctrine also applies to findings of fact. *See Quern v.*

*Jordan*, 440 U.S. 332, 347 n. 18 (1979) (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247 (1895) ("[N]o question, once considered and decided by [the] court, can be re-examined at any subsequent stage of the same case.")); *United States v. Ellis*, 57 F.3d 1067 (4th Cir. 1995) (unpublished table opinion); *Culpepper v. Irwin Mortg. Corp.*, 491 F.3d 1260, 1271 (11th Cir. 2007).

When Plaintiff initially brought suit, she alleged disparate treatment and disparate impact claims of gender discrimination. After this court's adverse summary judgment ruling on both claims, Plaintiff appealed only the disparate treatment claim to the Fourth Circuit. Therefore, Defendant submits that "[t]he preclusive effect of this Court's grant of summary judgment on plaintiff's disparate impact claim precludes any testimony offered by plaintiff at trial that is contrary to [the] court's findings."

Plaintiff has agreed that the court should not reconsider the disparate impact claim in its entirety. However, she argues that that a prohibition on reintroducing testimony relevant to the disparate impact claim would be inappropriate. She suggests that some of the facts germane to that claim are clearly relevant to the disparate treatment claim still pending before the court. However, this court's disparate impact decision relied on a small number of limited findings, which Defendant's motion has identified: (1) the PAT utilized by Old Dominion was not biased against females; (2) the PAT did not result in fewer female employees; and (3) the PAT had no disparate impact against Plaintiff or other women employed by Old Dominion. As the court has already decided the matter, and the findings were not called into question by the Fourth Circuit's decision, Plaintiff will be precluded from introducing evidence to the contrary.

During the hearing, counsel for the Defendant asked for broader relief, seeking a "global ruling" that the PAT, and its design and creation, are not at issue in this disparate treatment case.

In effect, Defendant seeks to preclude under the law of the case doctrine the same evidence that it seeks to preclude under the business judgment rule. *See* part C(3), *supra*. However, the court has not made findings about the propriety of the PAT, its design, or creation. Nor did it consider whether the test, as Plaintiff's expert would testify, is idiosyncratic or unreasonable. Instead, the court's findings were narrowly focused on whether the test yielded biased results. As the law of the case doctrine does not permit the court to accord the broad relief that Defendant now seeks, Defendant's motion will be denied to the extent it asks for such relief.

### III.   CONCLUSION

For the reasons given herein, the motion concerning back pay and front pay (docket no. 79) will be denied;  the motion concerning expert testimony (docket no. 81) will be granted in part;  the motion to preclude evidence as irrelevant will be denied (docket no. 83);  and the motion regarding the preclusive effect of prior rulings (docket no. 85) will be granted in part.

The Clerk of the Court is directed to send a certified copy of this opinion and the accompanying order to all counsel of record.

Entered this _2nd_ day of February, 2011.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE